UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOFFREY LAGADIA, | No. C 08-4115 SI (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| BEN CURRY, warden, | |
| Respondent. | |

## INTRODUCTION

Joffrey Lagadia, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Lagadia was convicted in Los Angeles County Superior Court of second degree murder in 1991 and was sentenced to 15 years to life in prison. His habeas petition does not challenge his conviction but instead challenges a March 5, 2007 decision by the Board of Parole Hearings ("BPH") that found him not suitable for parole.

The BPH identified the circumstances of the murder, Lagadia's prior criminality, and the fact that he continued to minimize his responsibility for the killing as the reasons for finding him unsuitable.

Lagadia sought relief in the California courts. The Los Angeles County Superior Court denied his petition for writ of habeas corpus in a reasoned decision. The California Court of Appeal and California Supreme Court summarily denied his petitions for writ of habeas corpus.

Lagadia then filed his federal petition for a writ of habeas corpus. The court found cognizable his claim that his right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole. Respondent filed an answer and Lagadia filed a traverse.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state

2

court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).  Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.      State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment.  See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a).

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in source).

---

[1] The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

1  Where "evidence of the inmate's rehabilitation and suitability for parole under the governing
2  statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity
3  of the commitment offense, and that offense is both temporally remote and mitigated by
4  circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the
5  commitment offense involved aggravated conduct does not provide 'some evidence'
6  inevitably supporting the ultimate decision that the inmate remains a threat to public safety."
7  Id. at 1191 (emphasis in source).

## B.    Federal Habeas Relief On Parole Denial Claims

The U. S. Constitution's Due Process Clause does not itself provide state prisoners with a federal right to release on parole. Hayward v. Marshall, 603 F.3d 546, 562 (9th Cir. 2010) (en banc). The substantive law of a state might create a right to release on parole, however. See id. at 555, 559. Although Hayward purported not to reach the question whether a California's substantive law created a federally protected liberty interest, see id. at 562, later cases from the Ninth Circuit have said or assumed it does. See Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that may be enforced as a matter of federal law. . . . By holding that a federal habeas court may review the reasonableness of the state court's application of the California 'some evidence' rule, Hayward necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause." ); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) ("In Hayward, we held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA"); id. ("we must examine the nature and scope of the federally enforceable liberty interest created by California's 'some evidence' requirement"); see also Pirtle v. California Board of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme gives rise to a cognizable liberty interest in release on parole.' McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir 2002). That liberty interest encompasses the state-created requirement that a parole decision must be supported by 'some

1 evidence' of current dangerousness. Hayward [603 F.3d at 562-63.]")  Hayward's application
2 and these later cases make it clear that in the Ninth Circuit there is federal habeas relief available
3 under § 2254 for California prisoners denied parole without sufficient evidence, although it now
4 appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

A federal district court reviewing a California parole decision "must determine 'whether the California judicial decision approving the governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)).  That requirement was summarized in Hayward as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety."  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. [¶] Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (footnotes omitted) (quoting Lawrence, 44 Cal. 4th. at 1210, 1213-14); see also Cooke, 606 F.3d at 1216 (describing California's "some evidence" requirement).

When a federal court considers a habeas case directed to a parole decision, the "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. § 2254(d)(2) for whether the decision was "based on an unreasonable determination of the facts in light of the evidence." Cooke, 606 F.3d at 1214 (citing Hayward, 603 F.3d at 563).

C.   Lagadia's Case

   1.   His Circumstances

Commitment offense: There was some conflicting information as to Lagadia's role in the attack, i.e., whether he hit the victim with a baseball bat or fought the victim without a baseball

6

bat before a fellow gang member hit the victim with a baseball bat.

> On or about November 4, 1989, Patricia Morales [and her fiancé, the victim, Miguel Sanchez,] went to visit some friends in Downey at about 8:30 p.m. After the visit, they left their friends at about 12:15 a.m. and drove down . . . Artesia Boulevard, towards Cerritos. As they drove in the victim's Cadillac, they had a disagreement and Patricia left the car at Shoemaker Street and Artesia Boulevard. She walked eastbound and the victim pulled in front of her, stopped the car, and again asked her to get inside the car. Patricia refused to get into the car. Speeding around the corner from . . . Carmencita Street to Artesia Street, three cars attracted Patricia's attention. Inside the vehicles were passengers yelling gang slogans at Patricia and the victim. They said, "Varial Santanas." . . . Patricia described the vehicles as a small silver truck followed by a Suzuki Samurai and a small car. They travelled to one another (sic), passed by them, and made a U-turn and came back toward them. The victim drove away from her. As the victim drove away, Patricia saw the truck driven by Lagadia cut off the victim, forcing the victim to crash into a pole on Vicki Street.

March 5, 2007 BPH hearing reporter's transcript ("RT") at 9-10, quoting the 2004 Board Report.[2] The victim got out of his car and threw a baseball bat at the truck and it landed in the truck bed. The victim was then unarmed. The victim was beaten to death with a baseball bat, with the cause of death being major trauma to the head. RT 10.

There was conflicting evidence as to whether Lagadia was the gang member who used the baseball bat to beat the victim. The probation officer's report stated that "the victim was attacked by the defendant with a baseball bat and severely beaten, causing injuries which resulted in his death." Traverse, Exh. A, p. 2. That also was the version in the 2004 Board Report, and that the commissioner read into the record. RT 10.

The California Court of Appeal's decision affirming the conviction stated that there was conflicting evidence from other witnesses as to whether Lagadia was the person swinging the baseball bat at the victim. Traverse, Exh. B. Lagadia testified that he only had fought with the victim, and that another gang member had hit the victim with the baseball bat. <u>Id.</u> at 14. The charging document had alleged personal use of a deadly and dangerous weapon, a baseball bat,

---

[2] Neither party bothered to make the 2004 Board Report part of the record for this court. Lagadia does not dispute the commissioner's recitation of what was in that report, although he disputes some of the accuracy of some of the factual statements in that report.

7

1  and the jury found that allegation "not true."  Id. at 2-3.³   The California Court of Appeal
2  rejected Lagadia's claim that the evidence was insufficient to support the second degree murder
3  conviction, and noted that there was testimony from one witness (i.e., another gang member) that
4  he saw Lagadia swing the bat at the victim, that the witness looked away and turned back to see
5  the victim falling, and that no one else was in the area at that time.  Id. at 19.

6  Lagadia did not discuss the commitment offense at the parole hearing.  However, in the
7  past, he had taken the position that he was not the person who hit the victim with the baseball
8  bat.

9  The BPH panel did not believe Lagadia's denial of responsibility for hitting the victim
10  with the baseball bat.

11  Prior Criminality: Lagadia was 19 years old and had a limited record when the murder
12  was committed.  As a juvenile, he had been arrested and charged with possession of a weapon
13  to commit assault and assault with a deadly weapon in 1988.  The petition was sustained as to
14  the weapon possession charge and he did community service.  As an adult, he was arrested and
15  charged with false imprisonment and battery.  According to the probation officer's report, the
16  "false imprisonment charge was dropped in exchange for a guilty plea to the battery in which
17  he received 120 days time served."  Traverse, Exh. A at 5.  Also as an adult, he was arrested for
18  disturbing the peace; he was arrested for the murder before that case was adjudicated.  See id.;
19  RT 10-11.

20  The probation officer's report also recounted some information obtained from a detective
21  that painted a very negative picture:

22  > Investigating officer, Detective Kuhn, stated that the defendant has had prior
23  > contact with the police and is a "Santanas" gang member. That the Santanas gang
   > is a Filipino street gang and the largest and most active gang in Cerritos. He
24  > stated that the defendant was arrested by Los Angeles Sheriff's
   > Department/Walnut, approximately two months prior to present offense for an
   > assault involving a baseball bat. The defendant was also under investigation by
25  > Ventura County Sheriff's for a murder, he was called in as a suspect witness. He

---

³Contrary to the apparent belief of Lagadia and the psychologist who wrote the 2005 evaluation, this does not establish that he did not use the bat. Rather, it means that the jury found that the sentence enhancement allegation was not proven beyond a reasonable doubt.

> notes that this was after his involvement in the present offense. He also stated that defendant has been involved in drive-by shootings, that his vehicle had been seen and identified; but that witnesses were not desirous of prosecution.

Traverse, Exh. A at 10. Another detective also opined that Lagadia had "extensive gang affiliation and is very sophisticated compared to other gang members" and was "an instigator of violence and confrontations." Id. at 11; see also RT 32.

Disciplinary Record: Lagadia had received two disciplinary write-ups: he had received a CDC-115 in 1995 for being out of bounds and had received a CDC-115 on an earlier date than that for being in possession of inmate-manufactured alcohol. RT 20. He also had received one CDC-128 for being out of bounds in 1994.

In-Prison Accomplishments: Lagadia had very favorable programming while in prison. He had his high school diploma before being incarcerated, and since being incarcerated had earned many credits toward his A.A. degree. RT 14, 17. He had completed two vocations, i.e., graphic arts and machine shop vocations. He had worked as a porter, food service worker, and recreation worker. He had received satisfactory to exceptional work ratings in his current job as a recreation worker. He had done self-help and group programs. He had participated in Alcoholics Anonymous since 1993 or 1994.

Psychological Reports: In a February 2005 psychological report, Dr. Sexton stated that Lagadia's diagnosis had improved: while he had an antisocial personality as a youth, there was no indication of that in the last 13 years. Dr. Sexton stated that, if released, Lagadia's violence potential would be "average for the non-offender population." Resp. Exh. 3 at Exh. B, p. 3; RT 26. The psychologist thought that "alcohol or drug abuse is unlikely in the future for this inmate" because the alcohol and drug abuse he did engage in was relatively minor and occurred while he was a youth. His "gang activity would be a precursor to violence if it were a probability at this time. There is no evidence to suggest that the inmate has maintained gang relationships or is actively participating in gang activities either in the community or in the prison." Resp. Exh. 3 at Exh. B, p. 4.

The 1999 psychologist's report said that there was a record of drug and alcohol abuse, and

1 that Lagadia was under the influence at the time of the murder.  RT 26.  Also, the 1999
2 psychological evaluation stated that the inmate was quick to blame his fellow gang member for
3 the baseball bat attack, and that his "'insight is in a transition period'" and would improve.  RT
4 27. The psychologist in the 1999 report estimated his violence potential to be "'somewhat higher
5 than the average citizen in the community.  Obviously, significant risk factors for potential for
6 violence for this inmate would be a return to the use of alcohol and gang involvement.'" RT 28.

   Lagadia stated at the parole hearing that he did not think gang involvement would be a part of his future or a problem.  RT 32.  He had remained in contact with some of his former gang member acquaintances, however.  RT 32.  The ones he stayed in contact with "basically are not inmates anymore but they have their own families to take care of and are doing really good." RT 32.  These people had dropped out of the gang.  RT 40.  He stated that there were no repercussions to dropping out of the gang he had been in.  RT 33.

   <u>Parole Plans</u>: Lagadia had plans to live with his family and had job offers.

### 2. BPH's Decision And State Court Review

The BPH determined that Lagadia was "not suitable for parole today" because he would "pose an unreasonable risk of danger to society or a threat to public safety if released." RT 51. The BPH relied on the commitment offense.  The severity of the beating showed that the killing "was carried out in a manner that demonstrates an exceptional callous disregard for human suffering." RT 53.  The killing was done for a motive that "was just not believable." RT 53. The BPH also relied on Lagadia's prior criminality that included assaultive behavior.  RT 53. And the BPH relied on the fact that he had not gained sufficient insight into the crime, as he was distancing himself from responsibility for the attack by blaming it on another gang member and passing it off as something done when he was a juvenile.  RT 48-53.   On the positive side, the commissioner noted that Lagadia had a very favorable prison record and encouraged him to continue on the same path.  The BPH recognized that this inmate had numerous positive attributes, but found them not to outweigh the circumstances that indicated he was not suitable

for parole.

The Los Angeles County Superior Court upheld the BPH's decision in a reasoned decision. See Resp. Exh. 3. As the last reasoned decision from a state court, the decision from the superior court is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The superior court found that some evidence did support the BPH's conclusion that Lagadia was not suitable for parole and presented an unreasonable risk of danger to society. Resp. Exh. 3, p. 1. The court found some evidence to support the finding that the motive was very trivial in relation to the offense: "The taunting of the victim's girlfriend led to the victim's reaction, which could have been ignored by the gang members. Several gang members instead beat up and killed the victim." Id. The court also found that the BPH properly considered Lagadia's prior act of assault as a juvenile. Id. at 2. And the court found that the BPH properly considered Lagadia's failure to fully acknowledge his role in the crime by asserting that he was not the one who hit the victim with the baseball bat. "Under this circumstance, the Board is unable to conclude that the Petitioner has remorse for his actions." Id. at 2.

### 3. Analysis Of Habeas Claim

There was sufficient evidence for the state superior court to uphold the BPH's decision. The murder was unusually brutal and was done for a trivial motive. Lagadia had a significant criminal history that included assaultive behavior and had been in a street gang before the commitment offense. The record also does provide support for the conclusion that he continued to minimize his responsibility for the killing, which suggested a lack of remorse. The reasons were supported by sufficient evidence, and so was the reasoning: the identified factors were relevant to and provided reliable evidence in support of the ultimate determination that he was currently dangerous.

On the acceptance of responsibility issue, the record is somewhat confusing. Lagadia did not speak about the crime at this parole hearing, but had spoken about it in the past. In some

places in the transcript, the commissioner appears to fault Lagadia for failing to acknowledge that it was he who swung the baseball bat at the victim. Elsewhere, however, the commissioner's comments seem to indicate that by always focusing on who swung the bat, Lagadia was failing to understand that he had some responsibility for the killing, even if he wasn't the one wielding the baseball bat.   The confused record does not affect the outcome, however.

If Lagadia did swing the baseball bat and personally inflicted the fatal blows, his continued denial of having done it showed that he lacked remorse and lacked insight into the crime. That would weigh heavily against a finding of rehabilitation.

Even assuming <u>arguendo</u> that Lagadia's version was true – i.e., that he did not swing the baseball bat at the victim – it does not follow that he had no legal or moral culpability for the crime. Lagadia was one of the drivers of the three vehicles of gang members who called out gang slogans and were driving in coordinated fashion when they went after the victim, he caused the victim's car to crash into a pole, and (after the victim emerged from the car and threw a baseball bat at Lagadia's truck and approached) Lagadia physically fought with the victim. Whenever the killing came up, however, Lagadia apparently focused solely on the fact that he wasn't the person who swung the bat. That troubled the BPH and showed a lack of understanding that he bore some responsibility for the killing. At the most basic level, Lagadia may have thought that, as long as it was not he who struck the victim's head with the baseball bat, he had no responsibility for the criminal episode and death. This would be a valid concern in evaluating any parole applicant's current dangerousness, but it was a compelling concern for this applicant whose criminal offense was gang-related, who keeps in touch with some people who also used to be in his gang, and who plans to move back to the exact same place he lived in when he was in the gang. Lagadia's statement at the hearing that the attack was done while he was young also didn't fare well with the BPH because that appeared to be another effort to avoid taking responsibility. The state court agreed that there was some evidence to support the decision that Lagadia had consistently minimized his involvement and responsibility.

The information available to the BPH supported a determination "that the implications

regarding the prisoner's dangerousness that derive from his . . . commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." Lawrence, 44 Cal. 4th at 1214. Lagadia's positive behavior in prison count in his favor, but it cannot be said that at this point they make a finding that he is not suitable for parole unsupported by evidence. Cf. Shaputis, 44 Cal. 4th at 1259-60 (upholding unsuitability determination for prisoner who, despite favorable programming and prison behavior, still had not gained insight into his domestic violence and murder of his wife). The state court's rejection of Lagadia's petition was not an unreasonable application of California's "some evidence" requirement and was not based on an unreasonable determination of the facts in light of the evidence. Lagadia therefore is not entitled to federal habeas relief.

D.     Certificate Of Appealability

A certificate of appealability is GRANTED as to the due process claim. See 28 U.S.C. § 2253(c). Reasonable jurists could find the district court's assessment of the claim debatable. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

**CONCLUSION**

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 4, 2010

SUSAN ILLSTON
United States District Judge